This action is one in trespass to try title to recover a block of 4 acres embraced in a 98-acre tract of land out of the David Hunter survey in Dallas county. Appellee is the record owner of the property, *Page 676 
but the principal appellant claims title by limitation.
The cause was submitted to the jury upon one special issue, in which was propounded conjunctively, the several specific issues of (1) peaceable and adverse possession; (2) cultivation, use, or enjoyment; (3) payment of taxes; and (4) claim under duly registered deeds. The issue was so framed that the jury could answer yes only in the event they found in the affirmative upon all the specific issues embraced in the question, and no in the event they resolved either of the issues in the negative. They answered, "No." In connection with the special issue the court correctly defined the terms used therein, and gave certain special charges requested by appellee and objected to by appellant, who has assigned error thereon.
Mary C. Logan is the common source of title. On February 4, 1886, she executed a deed of trust in which she conveyed 200 acres of land to secure the payment of a debt. In September of the same year she subdivided the same land into a townsite, and on February 24, 1887, conveyed block J in said townsite to M. P. Hayes, under whom appellee holds the legal title to the block. On February 27, 1891, the owner of the debt secured by the existing deed of trust released the deed of trust lien in so far as it covered block J, thus placing the title, unincumbered, in appellee's predecessor. Subsequently, on March 5, 1891, however, the deed of trust lien was foreclosed against the entire 200-acre tract, and in the ensuing sale the whole tract, embracing block J, was conveyed to the purchaser. On May 19, 1896, the then owner conveyed 98 acres out of the larger tract, including block J, which was specifically described in the conveyance. In similar conveyances the title to the 98-acre tract passed through various parties until it rested in appellants. In all these conveyances block J was specifically described as a part of the larger tract thus conveyed. These conveyances, all of which were recorded, constitute the duly registered deeds under which appellant claims its limitation title to block J.
Block J is situated in the center of the 98-acre tract owned by appellant. The larger tract has never been improved, except by a fence which marks its exterior lines. It has never been cultivated nor used, except as a pasture for live stock. There is no evidence tending to show when it was first inclosed, except that the fence around it was an "old fence" as far back as 1897, from which it may be inferred that it was so inclosed when block J was conveyed by the common source early in 1887. In 1886 the survey embracing the 98-acre tract was far removed from any center of population, At that time the tract, along with adjacent acreage, was subdivided in the form of a city addition "during a historic boom in the conversion of country farm lands into additions to cities," as suggested in appellee's brief. It was laid out into lots, blocks, streets, alleys, and roads, and given the heroic name of "Glencoe." On the plat, which was placed of record together with a formal dedication to the public of the streets, etc., block J was bounded by four streets, which were designated by the poetic names of Lucania, Thalia, Livania, and Illyria. The promoter's dreams of the future greatness of the potential city did not come true, however, for only a very few of the parcels were sold, and the visionary project was soon abandoned. Later some of the parties at interest went into court and procured a judgment setting aside and canceling the dedication. The public was so ungrateful, in fact, that present residents of that vicinity seem never to have heard of the ill-fated Glencoe, or, if they ever heard of it, had wholly forgotten its existence until reminded of it upon the trial of this cause. A number of them so testified. William Barr purchased block J. He has long since passed on; his daughter, appellee herein, succeeded to his title, and has herself grown "old and gray," according to the record. So far as the evidence discloses, she paid no heed to this small and isolated fragment of land, never assumed active dominion over it, or exercised any of the prerogatives of ownership, except in occasional years to pay the taxes on it. In the meantime, in 1892, others took conveyances of 98 acres of the subdivision, embracing block J, but they so lightly regarded the value of their purchase that they gave the use of the whole tract to a stranger for his services as caretaker, and paid taxes on it during only a part of their tenure. And now, 40 years have passed and the city of Dallas in its forward march of progress has approached and will soon envelope the effaced and forgotten Glencoe, which, after nearly half a century, is about to come into its own. The lands embraced within its dim and forgotten lines have stealthily grown into high values, and those who for so many years have slept upon their conflicting rights, now awakened by the rumble of the fast approaching city and aroused by the call of vaulting values, are at each other's throats. Wherefore this contest over the title to block J, stricken from public records, obliterated from memory, and marked only by phantom streets, whose names were evolved in the long ago out of the pathetic optimism and gentle romanticism of a past generation.
Block J has never been subjected to any use, occupancy, or control not common to the remaining portion of the larger tract which embraces it. It is not nor has it ever been segregated by fence or other evidence of individuality — is isolated only by imaginary lines of record description. It has never been used in any way except that stock pastured in the common inclosure passed at *Page 677 
will over its imaginary boundary lines, and appellant and his predecessors in title exercised no dominion or control over it except such as was merely incidental to the control and dominion over the larger tract. No act of possession, occupancy, use, or dominion has been done with specific reference to the smaller tract from which the true owner could infer that the claimant's possession was adverse to hers. Out of this state of facts arises the question of whether or not appellant's maintenance of the existing fence inclosing the larger tract, and the indiscriminate and common use of the whole premises, and, incidentally, of block J, constituted such adverse possession and use as will support a limitation title.
The active possession and use of the land by appellant and its predecessors began in 1901, when they repaired the existing fence inclosing the 98-acre tract, put their horses in the inclosure, and delivered the premises to a caretaker, who was given the use of the premises for the pasturage of her own stock, with the additional privilege of pasturing the live stock of others thereon for hire; she was also allowed to use the premises for "gardening and agriculture on a small scale." There was evidence that this caretaker went into possession under this arrangement, and continued that possession and use through the five-year period relied upon by appellant in support of his plea of limitation. If there is a question of fact upon which there was any conflict of testimony, it was the issue of use and possession, for the other questions were of law as applied to undisputed facts. Assuming that the evidence raised the remaining issue above adverted to, it becomes necessary to determine only if appellants were given a fair trial as to that issue. We think the presumption in favor of a fair trial is overcome by the showing as to the conduct of counsel, which will now be discussed.
It appears that in his opening argument to the jury one of appellee's counsel undertook to "explain" the special issues to be answered by the jury, and in doing so stated, according to the bill of exceptions, "that the defendants had pleaded a whole lot of different pleas, among which were the pleas of limitation of three and ten years, as well as the five-year statute, and that they had also vouched in their warrantors; that the finding of the jury that the defendants had had possession of the property for five years would take Miss Burr's property without compensation, which ought not to be done, and proceeded further to explain to the jury the effect of their answer to the special issue propounded by the court." When counsel for appellee began to explain to the jury the effect of their answer to the special issue counsel for appellant objected to a continuation of that line of argument, but the court overruled the objection and permitted counsel to proceed with his statement, although at appellant's request the court finally instructed the jury that "it is no concern of yours, and you should not, in the proper discharge of your duty, take into account the effect of the answers you may make to special issue No. 1, but your sole duty, under your oath, is to answer such question truly as you find the facts to be from the evidence and not otherwise, and you will disregard wholly and absolutely all argument of counsel for plaintiff as to the effect of your answers on the plaintiff or defendants, and disregard whether either party will or will not suffer loss on account of the manner in which you answer said question." But at a later stage of the argument appellee's counsel, according to the bill of exceptions, "after having explained to the jury two or three different times the effect of their answers to the special issues propounded by the court, told the jury, turning and referring to Miss Burr, who was an aged lady with gray hair, in the presence of the courtroom, that it would be unfair for them to find in favor of defendants' plea of limitation and thereby take away from Miss Burr her land, and it would be especially unfair to do so because of the fact that it would be taking all she had, and that they could take the land, by their verdict, away from the defendants and they would still have $50,000 worth of land, and that they, the defendants, would not lose anything by such verdict on their part, as the defendants could recover what they had lost from their warrantors and would do so, and counsel for defendants objected to this argument and statements made by counsel for the plaintiff at the time he began to make same, and asked the court to stop him and restrain him from making said statements and remarks, which the court refused to do." And, further, "counsel, after having at a preceding point in his argument to the jury explained the effect of their answers to the special issue, proceeded to tell the jury that the defendants had vouched in Nussbaum and Simmons, who are warrantors of their title; that when counsel began to make the said explanation and statement to the jury, counsel for the defendants objected to Mr. Titterington's remarks and asked the court to restrain counsel and prevent his discussing the effect of such plea and the rights of the defendants on their warranty, but the court refused to restrain counsel or stop him, and counsel was allowed to proceed, over the objection of the defendants, to, and did, tell the jury, in substance and in effect, that defendants would not lose anything if the jury held against their plea of limitation involved in special issue No. 1, because defendants had a cause of action against their warrantors and had sued them in this suit, as he had shown them by the pleadings and *Page 678 
judgment would be given defendants against their said warrantors for the value of the land which they would lose by such verdict of the jury, because one of such warrantors, Simmons, was a wealthy banker at Hillsboro, and Nussbaum, the other one, was a successful business man at Mexia."
This conduct and argument of counsel for appellee is complained of by appellant in his third and fourth propositions of law, which must be sustained. It is too well settled to require the citation of authorities that counsel must refrain from explaining to juries the effect upon the whole case of their answers to specific issues submitted to them, and from coaching juries in the art of determining the whole case by returning answers to specific issues in accordance with a system adroitly pointed out by astute counsel. The whole purpose of special verdicts is to procure jury findings on the specific issues of fact submitted to them, without reference to the legal effect of those findings, with which the jurors must not concern themselves. The system is designed to exclude from the jury room, as much as possible, the influences of sympathy, bias, and prejudice, so that jurors may go untrammeled into consideration of purely fact questions, and determine such questions from the evidence alone without eager or troubled apprehensions as to the effect of their answers upon the fortunes or misfortunes of the respective litigants. The average juror is, happily, but human, and, being but human, is, happily again, amenable to the appeals of sympathy and all the other human emotions. When aroused, those emotions operate in some degree to swerve the normal person from the course of reason and judgment, and in the case of a juror to influence him in the determination of an issue of fact. It is in recognition of this human attribute in jurors that lawyers are required to confine their arguments to the record and to refrain from appeals to passion and prejudice; and litigants are further safeguarded against the operation of these influences by the statutory provision for special verdicts, and by the rule that jurors shall consider and pass upon the issues of fact submitted to them without instruction from the court or suggestion or coaching from counsel as to the effect upon the litigants of their findings upon those issues. The case here presents a flagrant disregard of these rules. Counsel for appellee "explained to the jury two or three different times the effect of their answers to the special issues propounded by the court." When opposing counsel objected to this argument, the court overruled the objections and by doing so impliedly approved the argument, thus fixing in the minds of the jury the process by which they could and thereafter did determine the whole case by their answers to specific issues of fact. It is idle to say that the suggested process was eradicated from the minds of the jury by the subsequent instruction that they were not concerned in that process and must disregard it and the argument and instruction of counsel thereon.
The argument of counsel as to the relative financial worth of the parties to the suit, the contrast between the gray-haired old lady on the one side and a wealthy corporation upon the other, and the adroit suggestion that if appellee lost the case, if the jury answered the special issue in the negative, she would lose all she had, while if the corporation lost it would still have $50,000 worth of land, and would be protected against the loss upon its wealthy codefendants' warranty — all this argument was in flagrant contravention of the rules, and certainly was prejudicial in its effect. Appellant's timely objection to this argument but accentuated the duty already resting upon the trial judge to stop the argument upon his own motion, and the action of the court in overruling the objection and permitting counsel to proceed in that line of argument amounted to an implied instruction to the jury to give effect to that argument in considering and answering the special issues in the manner and with the effect pointed out to the jury by counsel. The verdict was against the preponderance of the evidence, to say the least of it, and it is not difficult to surmise that this result was due to the improper argument of counsel and the court's implied approval thereof. The court should have set aside the verdict and granted a new trial. Other questions are raised, but it is not deemed necessary to discuss them in view of another trial.
The judgment is reversed and the cause remanded.